BOYLE v. STATEN ISLAND & S. B. LAND CO., Limited.

(Supreme Court, Appellate Division, First Department. May 14, 1897.)

1. PRINCIPAL AND AGENT—WHEN RELATION EXISTS—EVIDENCE.
    One M. desired to sell his residence and buy another place, and he so informed plaintiff, who was president of a land company to which M. had sold an adjoining tract of land. Plaintiff proposed that the land company should buy it, and later he informed M. that he (plaintiff) had found a house which would suit M. Further negotiations resulted in an agreement by which M. sold his house to the land company and bought the house suggested by plaintiff, paying the difference of price ($20,000) by delivering to plaintiff securities of that value. Plaintiff did not claim to be the owner of the house bought by M., and in fact it was owned by a third person, whom plaintiff paid by delivering railroad bonds worth less than $20,000. The securities received from M. were retained by plaintiff for his own use, but M. was not informed of this. At the beginning of the negotiations M. asked plaintiff how much his "commissions" would be, and they finally agreed on $500. M. had an account with plaintiff, who was a banker, and the $500 were paid by charging M.'s account therewith as "commissions" paid by him. *Held*, that plaintiff acted as agent for M. in the transaction, and was accountable for the difference between the value of the securities received by him from M. and the value of railroad bonds used in payment for the house sold to M.

2. ACTION—RIGHT TO WAIVE TORT AND SUE ON CONTRACT.
    Where the agent of a purchaser received securities to pay for the property, but without the purchaser's knowledge used other securities of his own, of less value, to make the payment, the purchaser may waive the tort and sue the agent on an implied contract to repay the difference in value.

Appeal from judgment on report of referee.

Action by William Lewis Boyle against the Staten Island & South Beach Land Company, Limited, on promissory notes. There was a judgment in favor of plaintiff, and defendant appeals. Reversed.

Argued before RUMSEY, PATTERSON, O'BRIEN, INGRAHAM, and PARKER, JJ.

Robert L. Harrison, for appellant.
Willard Parker Butler, for respondent.

PARKER, J.  The defendant was incorporated in November, 1890, to take over and sell certain lands situate in the county of Richmond, known as "Arrochar Park."  The tract embraced some 130 acres, and was laid out in lots for sale, which were at that time in the market.  For a time Messrs. H. T. Metcalfe & Sons, real-estate agents, had charge of the property.  But the owner, Mr. W. W. MacFarland, became acquainted with the plaintiff under circumstances which induced Mr. MacFarland to repose confidence in him, and some time in July or August, 1890, Mr. MacFarland made the plaintiff his agent to make sales on commission.  In this he was not successful, and subsequently he suggested to Mr. MacFarland the formation of a corporation to take over the property, and expressed confidence, if he could have entire charge of the matter, and be allowed to exercise his discretion, that through such an organization the property could be disposed of quickly and profitably.  The mortgages upon the property at that time aggregated $93,000.  The agreement under which the company was organized was, in substance, that the company should assume and pay all the mortgages, aggregating $93,000; pay MacFarland $100,000 in five years, with interest at 6 per cent., for which sum he was to receive the notes of the company; issue $200,000 of capital stock, of which MacFarland was to receive $96,000, and the plaintiff $104,000.  In addition to the $100,000 of notes issued to MacFarland for purchase money, 25 notes of the company of $1,000 each were issued to the plaintiff, which he agreed to take and pay for in cash, in order that the company should have a working capital.  The capital of the company consisted exclusively of the land, which, prior to its being conveyed to the company, belonged entirely to MacFarland, while the capital stock and notes mentioned represented the sole consideration for the land.  The shares allotted to the plaintiff were issued as compensation for his services, and for furnishing an office for the company, and paying the wages of necessary clerks.  After the formation of the company, Mr. MacFarland, although a director, took no active part in the management of it until January, 1893, and seldom attended the board meetings.  The plaintiff was the president of the company, and substantially controlled its affairs until the annual election in January, 1893, when the stockholders refused to elect one Rokeby a director at the request of the plaintiff.  This action he resented, and it led to an investigation of the affairs of the company, and an examination of its books by an accountant, with the result:  (1) That after the meeting of February 9th the plaintiff took no further part in the management of the affairs of the company, although he remained nominally its president until the next annual election; and (2) in the making of charges on the part of MacFarland of improvident sales of land, the declaring of fraudulent dividends by the corporation, and other charges of irregularity, which we shall not stop to refer to.  Thereafter the plaintiff brought four suits against the defend-

45 N.Y.S.—32

ant, the land company,—the first for a balance of the amount due him as banker of the company; the second and third to recover the amount of certain past-due coupons on coupon promissory notes of the defendant; and the fourth to recover the principal of the promissory notes, the coupons of which formed the subject of the second and third actions. The actions were consolidated, and were referred by consent. Several defenses were interposed by the answer of the defendant to the various claims of the plaintiff, and various counterclaims set up, one of which was an account held by the defendant as assignee. The result was a judgment in favor of the plaintiff for the full amount claimed, the counterclaims of the defendant not being sustained.

. With the decision of the learned referee we are in agreement, with one exception. That several of the transactions of the corporation, of which this plaintiff was the controlling spirit, were improvident and wasteful, seems clear; but the plaintiff took the precaution, before acting, in all such transactions, to submit the matter to the board of directors, and obtain their direction, by resolution duly prepared in advance; and the defendant is, therefore, not in a position to make a claim against the plaintiff for the loss resulting therefrom. But there is one counterclaim, acquired by the defendant from MacFarland by assignment, which we think was established by the evidence, and should have been allowed. It grows out of the following transaction: When MacFarland conveyed the tract to the land company, he reserved his residence known as "Arrochar House," and some seven or eight acres of land about it. Later on he made up his mind to sell it if favorable opportunity presented itself, and move to the city, and he so informed the plaintiff in August or September, 1891. About the middle of November the plaintiff went to MacFarland's office, and told him that he thought he had found a couple of houses that would suit him, but a decision would have to be made quickly. The next day the plaintiff and MacFarland looked at the houses, and the plaintiff said, according to MacFarland's testimony, that the owners asked $70,000, but he thought they could be bought for $67,000. MacFarland said he could not buy unless he could sell Arrochar House, and the plaintiff suggested that the land company should buy it. The day following, MacFarland had the Riverside houses appraised, and they were valued at $54,000, and were subject to mortgages aggregating $47,000. MacFarland told the plaintiff that he would buy the houses for $67,000, if the land company would buy Arrochar House at $47,000, and the payment could be so arranged as to enable him to meet the mortgages on the Riverside houses when they fell due. The plaintiff at once laid the matter before the board of directors of the company, with the result that the company agreed to buy Arrochar House on the terms proposed. Arrochar House was conveyed to the land company, and Mr. MacFarland handed to this plaintiff cash, notes, and securities equivalent to cash, aggregating $20,000, and thereafter received a deed for the Riverside houses, subject to the mortgage of $47,000. Subsequently MacFarland learned that the plaintiff did not turn over

the $20,000 to the vendor of the property, but that instead he gave him $25,000 of railroad bonds, which the evidence tends to show had but little, if any, value; the result of the transaction being a handsome profit to the plaintiff at the expense of MacFarland, who insists that he supposed the $20,000 was demanded by the owner of the property, and not that the plaintiff had made an arrangement by which he was to secure to himself some considerable portion of Mr. MacFarland's $20,000. That the plaintiff made some profit out of MacFarland is established beyond dispute, and the question is whether he had the right to do it. The answer must, of course, be in the affirmative (1) if he held himself out to be the owner of the property, and negotiated with MacFarland on that basis; or (2) if, being the agent of MacFarland, the plaintiff disclosed to him all the facts in relation to the transaction before title was taken. But the answer must be in the negative if he acted as the agent of MacFarland, and did not disclose the facts.

It will be serviceable, in weighing the testimony of the plaintiff and MacFarland upon these questions, to have in mind the relation in which each stood towards the other throughout the negotiations for the purchase of the Riverside houses. It is apparent from the facts already stated that, prior to the formation of the land company, MacFarland was the owner of a valuable, but non income producing, estate, incumbered by mortgages to an extent that made the carrying of the property a burden to a man dependent upon his professional income to maintain a family, and pay interest and taxes, as well as to provide for maturing mortgages. His professional engagements would not permit him, had he been otherwise qualified, to undertake laying out the tract into lots, and finding purchasers for them. The plaintiff, claiming to have the necessary skill, suggested a method by which he asserted he could accomplish the desired result; and MacFarland, not doubting the great value of his property, was full of confidence that the plaintiff was the man to produce something like its value in cash. This confidence was shown, not only by a prompt and complete acceptance of the scheme of the plaintiff as to the formation of the company by which the plaintiff acquired substantial control of MacFarland's property, but also by the omission of MacFarland to exercise his functions as a director until some time after his purchase of the Riverside houses. Business prudence should have prompted him to pay more attention to the details of the land company than he did. He was interested in the result to the extent of $100,000, besides his stock holdings, amounting to $96,000; and therefore he should have been watchful of the plaintiff's methods, and should have carefully observed the development of his scheme, in order that he might promptly have ascertained whether it promised the relief desired or threatened to add to his burden. But what common prudence dictated in the premises he neglected. A careful search for the cause is not required, for it is readily found in his confidence in the capacity, friendship, and honor of the plaintiff. While MacFarland was entertaining this view of the plaintiff, the opportunity was presented for betraying MacFarland's confidence to the profit

of the plaintiff, and we shall now inquire whether he availed him-
self of it.

At the outset it should be observed that a studied effort has been
made in behalf of the plaintiff to create the impression in the mind
of the court that MacFarland's leading motive in the Riverside
house transaction was to unload the Arrochar House property on
the land company at an exorbitant price; and the transaction had
between the plaintiff and the minority stockholders, which resulted
in a payment to them by him of $1,350, alleged to be the extent of
the overpayment for the Arrochar House property which their
shares sustained, it is claimed, points in that direction, and at
the same time tends to support the plaintiff's claim of an intent to
deal fairly with the land company. This sum in no wise measured
the profit of the plaintiff out of the transaction; and in searching
for his motive in permitting the minority stockholders to share to
this extent in the spoils of the transaction, the most reasonable one
that suggests itself is that the plaintiff wished to secure their sup-
port as directors and stockholders in the struggle for the control
of the land company, which his knowledge of its affairs must have
persuaded him would soon be at hand. But, whatever his motive,
it is certain that MacFarland knew nothing of that transaction;
nor was it needful to pay such amount as an inducement to the
directors to sanction the purchase of the Arrochar House property,
for that was readily given by a resolution of the board of directors,
upon the instance of the plaintiff, before a division of the profits
was either made or suggested. The passage of that resolution does
not indicate that the directors were at that time of the opinion that
they were paying too much for Arrochar House, nor is it conceiv-
able that MacFarland could have been willing to throw away a
number of thousands of dollars provided he could saddle an equal
amount on the land company; for he would necessarily assume a
large part, and possibly the whole, of the burden thus placed upon
the land company, it having issued to him $100,000 of interest
bearing notes, which were payable before there could be a dis-
tribution to the stockholders. But it is unnecessary to go outside
of the plaintiff's testimony to find a denial of the insinuation that
MacFarland supposed he was defrauding the land company, and
therefore himself, by selling to it Arrochar House at an exorbitant
price. Upon that subject the plaintiff testified as follows:

"Reasons arose which, in my judgment, made it necessary for the land com-
pany to acquire Mr. MacFarland's interest in the so-called 'Arrochar House
Property.' This property was subsequently purchased by the land company
from Mr. MacFarland. Q. State the circumstances which led up to the pur-
chase of the Arrochar House Property. A. * * * The land company was
in the market to sell its property, and my instructions on behalf of the land
company to our man Wallace, in charge down there, was to let everybody run
over our property, considering it was a good way of advertising it. Mr. Mac-
Farland did not like this, and said people used to come strolling on his lawn,
and he objected to having these people wandering around his place Sunday.
We thought it was a natural complaint. On the other hand, it was impossible
to keep them off. * * * Mr. MacFarland had a lot of huge dogs down there,
—some five,—and they used to scare the lives out of the people; and we found
it was impossible to sell this property except by getting the people on the
grounds, and giving them carte blanche to go where they wished to. This

trouble was always on, and we used to discuss it,—Mr. MacFarland and my-self,—and he said the best thing he could do would be to sell his property and get out. We asked him what he wanted. He told me the property was worth a fabulous sum. I do not remember what it was. Eventually it ,was settled he would sell the property for $47,000. Mr. MacFarland, at the time that he said he would sell, very naturally said .that before he could move out, and give us possession, or would come to terms, he would have to have a new place to live in, and he did not want to go and live in New- York."

Thus it appears from the lips of the plaintiff, not only that Mac-Farland regarded Arrochar House as of great value, but that the plaintiff and his co-directors were in favor of acquiring, and through the plaintiff sought to acquire, Arrochar House for the land company, before the Riverside houses were ever mentioned, and that the price at which Arrochar House was sold to the land company was fixed at the very beginning of the negotiations. Let us now inquire whether the plaintiff held himself out to be the owner of the Riverside houses, and conducted negotiations with MacFarland on that .basis. In support of that contention the plaintiff intro-duced in evidence the following memorandum:

Boyle & Co.                                            47 Wall Street.
    Cable Address,
        Effulgent,
            New York.                    New York,        18
I take $6,000 in cash,
        6,000 Land Co.'s notes,
        2,000 deposit receipts,
        1,000 bank stock,
        5,000 Boyle makes loan.
        ⎯⎯⎯⎯
    $20,000                   .
Land Co'y buy $47,000 Arrochar from McF—
7,000 cash—in one year
            & $40,000 in 3 years.
                W. W. MacFarland.
                Boyle & Co.

It seems that it was not convenient for MacFarland to pay $20,-000 in cash on a few days' notice at the time of the purchase of the Riverside houses, and he advised the plaintiff of that fact; and so they sat down and made up a memorandum of the cash, securities, and obligations with which the amount of $20,000 could be made up. These securities Boyle & Co. proposed to accept and use as cash, and as a matter of fact they were in value the equivalent of cash. Viewed in the light of the circumstances attending the mak-ing of the memorandum, including its object, the words "I take" do not necessarily import that Boyle was taking $20,000 for his equity in the Riverside houses; but rather that Boyle & Co., bank-ers, who agreed to furnish the ready money for the purchase of the houses, were to "take" from MacFarland the notes and securities mentioned for such purpose. At least it is quite clear, in view of other facts, to which reference will be made, that other evidence than is found in this memorandum will be required to support a finding that Boyle held himself out as the owner of the property. The plaintiff's testimony contains the only direct evidence that the case affords from which it can be claimed that he represented him-

self to be the owner of the Riverside houses in his negotiations with MacFarland. He testified:

"I told Mr. MacFarland, if he wanted to go to town, I had two houses which I had bought for myself, which I thought would satisfy him; and I told him about them; and, if I remember right, I told what the transaction was when I bought them in particular."

His testimony contains no other suggestion of a statement to Mac-Farland that the houses belonged to him. Two folios later he testified:

"I told MacFarland that I would trade him the Kansas City bonds; in other words, that I had to buy these Kansas City bonds; they did not belong to me; and I would give him the $25,000 of Kansas City bonds, and get Weidenfeld to take a lot of other stock, to make a trade."

The last sentence quoted was certainly not suggestive of ownership in Boyle, but it was of ownership in Weidenfeld. If the plaintiff owned the property, all he had to do was to take the $20,-000 which MacFarland had to offer, and convey, or have conveyed, the title to MacFarland. There was certainly no occasion for him to buy Kansas City bonds to turn over to MacFarland for his $20,-000, for it was the real estate that MacFarland wanted, not the bonds; and the purchase of bonds was certainly of no assistance in the transaction between MacFarland and the plaintiff, if the plaintiff was in fact the owner of the property. Neither was his subsequent conduct in completing the negotiations such as to convey the impression that he either was the owner of the property or held himself out as such to MacFarland. The title to the property at the commencement of the negotiations was in the Squier & Whipple Company, with whom Weidenfeld had made an agreement to exchange the equity of a property which he owned in Jersey City for the equity in the Riverside houses. Weidenfeld was a friend of the plaintiff, and they made some arrangement between them by which the $25,000 of Kansas City bonds was made to represent the alleged equity in the property. Just what was the nature of the transaction between Weidenfeld and the plaintiff, the record does not satisfactorily advise. In what proportions, if at all, they shared in MacFarland's $20,000, is not clear; but at the time the negotiations were entered into between the plaintiff and MacFarland for the sale of the Riverside houses, which resulted in a very few days in the closing of the transaction, Weidenfeld had simply an agreement with the Squier & Whipple Company for an exchange of properties. When MacFarland was first advised that the title would be passed, he was told to attend at the office of Squier & Whipple Company, and he did so. For a reason not necessary to mention, the transaction was not closed on that day; and he attended at a later day, when the title to the Riverside houses was conveyed to him. Neither Weidenfeld nor the plaintiff ever had title. MacFarland, on the other hand, denies that Boyle ever told him that he was the owner of the Riverside houses. On the contrary, he testified that the plaintiff distinctly told him at the outset that the Squier & Whipple Company was the owner of the Riverside houses, and that they wanted $70,000 for the property, but that

he thought the houses could be bought for $67,000; $20,000 to be paid down at the time of closing the transaction. There are other features of MacFarland's testimony, which will be referred to in another connection, which support his contention that the plaintiff never pretended to be the owner of the Riverside property. That he was entirely right about it, the history of the negotiations, the situation of the parties, and the location of the title seem to show. Indeed, it is quite apparent that the suggestion of the plaintiff that he told MacFarland that he was the owner of the property is an afterthought, born of a necessity to present some other than the real situation, if he would keep the profit made out of his friend.

Having reached the conclusion that the plaintiff did not hold himself out as the owner of the property, the next question is whether he was acting as agent for MacFarland. That he intended to make some money out of the transaction is quite clear. But he would now have it believed that whatever money he intended to make was not by way of commissions as agent, and he flatly denies that he was the agent of the defendant in this transaction. MacFarland testifies that at the beginning of the talk about the sale of the Arrochar House property and buying city houses, he spoke to the plaintiff about the question of compensation; that no distinct sum was fixed, but that, when the proposed purchase of the Riverside property was brought to his notice by the plaintiff, he said to him: "Well, I shall want to know something about your commissions. You are not a real-estate broker. I don't know what the charge will be." But no distinct sum was fixed; it being the witness' recollection that the plaintiff said he would only charge a reasonable sum. After the title to the Riverside houses had been vested in MacFarland, he testified that the plaintiff came to his office, and they had a talk about the question of commission, and the sum of $500 was agreed upon; and he gives it as his impression that it was paid by his directing that a balance which he had to his credit with Boyle & Co. should be charged up. After the close of the Riverside house transaction, there was to the credit of MacFarland on the books of Boyle & Co. $557.32; and it appears from the books of Boyle & Co. that subsequently the following entry was made: "$557.32 commission paid by W. W. MacFarland on purchase of two houses, Riverside Drive, New York." Thus the account was balanced on the books. The bookkeeper of Boyle & Co. testified that the entry was made in his handwriting. The evidence furnished by the books of the company is competent, and furnishes substantial corroboration of MacFarland's version of the transaction. The plaintiff attempted to make an explanation which would cause the word "commission" appearing on his books to be less damaging to him. He asserted that the word "commission" should not have been used by the bookkeeper; that it was an inapt word; and that the item really represented a profit on the transaction made by the Western Loan & Securities Company, of which he was the president. But the explanation is entitled, we think, to far less credit than the expression, put on the books at a time when it was not

supposed that the character of the transaction would be the subject of inquiry. That the plaintiff was undertaking to help MacFarland acquire title to the Riverside houses in some capacity is unquestioned. That he was conducting the negotiations as an agent seems to be established by the evidence.

We are thus brought to the remaining question,—whether Boyle told MacFarland about the bonds. MacFarland says he did not. There are no circumstances in the record tending to show that he did. The fact that the Kansas City Railroad bonds, if they had any market value whatever, were worth much less than $20,000, supports MacFarland's assertion that he knew nothing whatever about them, but supposed he was paying $20,000 for the equity in the Riverside houses; not that he was buying bonds. And Boyle, who would have it appear that he would not deceive MacFarland, nowhere in his testimony asserts positively that he told MacFarland all about the bonds. The plaintiff was cross-examined by MacFarland on the subject, and testified that he made an arrangement with Weidenfeld by which Weidenfeld was to take $25,000 of the Kansas City Railroad bonds for his equity in the Riverside houses. He also testified: "I don't remember whether the contract between Weidenfeld and myself was brought to your attention. I said, 'I think I told you about what I heard about getting the houses.'" And again, on cross-examination by Mr. MacFarland, he testified: "I think I told you I traded in some Kansas City bonds at interviews we had about the time this paper was signed. I don't exactly remember the date." But nowhere in the course of his testimony will there be found an attempt to give a conversation in which MacFarland was informed of the fact that Kansas City Railroad bonds were to play any part whatever in the transaction relating to the Riverside houses. The conclusion, therefore, is necessary that Boyle did not advise MacFarland about the bonds, and it follows that the finding of the referee in that respect is against the weight of evidence, and should be reversed.

It was MacFarland's privilege to waive the tort and sue upon the implied contract, the law assuming a promise by Boyle to return the money to MacFarland. Such a claim is the subject of counterclaim by MacFarland's assignee. Rothschild v. Mack, 115 N. Y. 1, 21 N. E. 726. Whether, upon the retrial, Boyle will be able to reduce the amount of the counterclaim below $20,000 and interest, will likely depend upon his ability to show that he did give something of value for the equity in the Riverside houses, and what such value was.

The judgment should be reversed, and a new trial granted before a new referee, to be appointed in the order to be entered hereon, with costs to appellant to abide the event. All concur.